HAYES *v.* FREDERICK STEARNS & CO.

130   287|
136   ⁴348|

130   287,
f156  ⁴479

1. NEGLIGENCE—DANGEROUS OPENINGS.
   Trapdoors are dangerous openings, and, when left open, should be properly guarded.

2. SAME—REMOVAL OF BUSINESS—TRAPDOOR.
   The disorder and confusion incident to the removal of a business to another location does not relieve the proprietor from the duty to an employé, who has never been there before, of properly guarding a trapdoor.

3. MASTER AND SERVANT—UNKNOWN DANGER—DUTY TO WARN.
   An employé who, in a strange place, is set to work carrying a box, in a manner to obstruct his view, upon a platform used for unloading goods and as a traveled way for employés, has a right, in the absence of any warning, to assume that there are no dangerous openings in the platform.

4. SAME—DANGEROUS PLACE—NEGLECT OF FELLOW-SERVANT TO WARN.
   Where the action of the defendant in constructing a trapdoor and leaving it open in the line of travel contributes to the injury of a servant, the employer cannot escape liability on the ground that a fellow-servant saw and knew of the danger, and might have prevented the injury by warning the plaintiff.

Error to Wayne; Carpenter, J. Submitted January 30, 1902. (Docket No. 110.) Decided April 8, 1902.

Case by John R. Hayes against Frederick Stearns & Company for personal injuries. From a judgment for plaintiff, defendant brings error. Affirmed.

*Edwin F. Conely* and *Orla B. Taylor*, for appellant.

*James McNamara* and *Frank C. Cook*, for appellee.

MOORE, J. This case was commenced in the circuit court to recover for injuries received from falling through an open trapdoor. It was tried before a jury. The plaintiff recovered a judgment of $2,500. The case is brought here by writ of error.

The defendant company is engaged in the business of manufacturing chemists. In the latter part of 1899 and early in 1900, it moved its business from the west side of the city of Detroit to the corner of Bellevue and Jefferson avenues. The new laboratory covered nearly a block. It was three stories high, and built around a court. At the time of the accident plaintiff was 29 years old. Prior to the accident he had worked 4 or 5 years for defendant company, running two hydraulic presses. He was sent to work at the new laboratory Friday, January 19th. He worked a few hours in the tablet department. The balance of that day and on Saturday he worked in the pill-finishing room. The following Monday he was set to work in the elixir room, unpacking and assorting jugs, and continued to work there until the time of the accident, which was on the morning of Wednesday. At this time the defendant was still engaged in moving, and did not get fully settled in its new quarters until some weeks later. The version of the plaintiff of the transaction is substantially as follows:

"As we unpacked the bottles, we put the excelsior, shavings, and mats into a large, rough, board box. I brought it in from the courtyard. This box was about 4 feet long, 3 feet broad, and 4 feet high. We put about

100 or 150 pounds of sawdust, shavings, and excelsior into that box. The shipping room is in the same side of the building, closer to Jefferson avenue. It might be a couple of hundred feet from the door coming out of the fluid-extract room to the door going into the shipping department; the doors being on the same side of the court. The door to the fluid-extract room is about on a level with the yard. Outside of the door leading into the shipping room there is a platform. There are two doors going into the shipping room. This platform might be about 90 or 100 feet long, and about 9 yards wide. It is 3 or 4 feet high,— high enough for a wagon to back up against, and load and unload straight to the wagon. It was used for that purpose. At the south end of the platform there are steps leading up to it. At the north end there is a slope about 10 or 15 feet long. There was no other way of getting into the shipping room from the fluid-extract department except through these doors.

"When we got the box filled with shavings and excelsior, Callan told Olschefski and me to take it to the shipping room. He said he could use it over for repacking some stuff. I had never been in the shipping room up to that time, nor had I ever been on this platform outside of the shipping room. Olschefski took the front end of the box, taking hold of it at the bottom, and I took hold of the back end. His back was towards me. I got hold of the box underneath. There were no handles upon it, nor was there any way of taking hold of it except to take hold of the bottom. I lifted it up the length of my arms, and walked straight along. The top of the box came right up in front of my face. I could not see over it. When we came out of the fluid-extract room we went along the yard until we got to the sloping end of the platform, which we went up. The platform was piled up with cases of drugs and barrels. They were right on the inside of the platform, piled along by the wall. They extended out far enough from the wall so as just to leave a passageway to walk on. They were along the whole platform, except the space opposite the door, which was left vacant. This passageway was about 3 or 4 feet wide. When we walked up this sloping end of the platform, we went along the passageway until we got as far as the trapdoor. That might be about 15 feet from the end of the platform. We had not got as far as the door opening into the shipping room. By the 'trapdoor' I mean a hole cut in the platform. It

was about 3 feet square. It was on the outer edge of the platform,—right on the passageway where we were walking. There was no cover over this hole. When I came to this hole I fell right into it,—down into the basement. That was the first time I ever saw the hole,—when I was taken out of it. I did not see it when I fell into it. I walked along with the box, just as I was walking, and the first thing I knew I dropped right into it. I fell down to the bottom. It might be 5 or 6 feet deep. There was a cellar under this platform, for shavings, packing, and stuff, and a concrete floor. I did not know that this hole was there when I stepped into it."

He received injuries which are claimed to be permanent. Olschefski testified:

" It was a box that was made to pack 2 gallon bottles in. It was 1 foot 6 inches wide by 3 feet long and 2 feet deep. I nailed handles on each end, so that we could carry it more easily. They were made out of boards, and stuck out about 2 feet at each end. I nailed them on the box about 10 days before the accident happened. I was working with that box every day,—using it to carry shavings out in."

Other witnesses testified to about the same thing. Testimony was given tending to show there was room enough, because of the projecting handles, so that plaintiff could see, between the end of the box and his body, where he was going. This is denied on the part of the plaintiff. Olschefski testified that he warned the plaintiff of the existence and approach to the hatchway as they passed along, carrying the box. His testimony is: "I told plaintiff to look out for it. Those are the words I used." Plaintiff denies that he was warned. The jury were charged:

"If the plaintiff was informed by Olschefski, who accompanied him, of the existence of this hole, then he had all the information that he could have had from the defendant itself, and consequently there could be no recovery."

Counsel contend negligence was not shown, and say:

"It is beyond all controversy that the plaintiff knew, or had ample warning, that things were not in order, and

that at any moment and at any place he was likely to find some article where it did not belong, some portion of the building unfinished, or some place not in a condition justifying heedlessly walking through or about it.   *   *   * The situation of the plaintiff was like that of an employé engaged in the construction or reparation of a building. Everything was in a formative condition, or in a state of transition.   The employés and their superiors were each and all engaged in an effort to bring order out of the confusion into which everything had been thrown by reason of the removal of the laboratory and its incidents.   The very condition of things admonished each employé that he must not take anything for granted.   The rule of duty to furnish a safe place has no application here.   The place was as safe as places of this sort, or under such circumstances, usually are.   *Andre* v. *Elevator Co.*, 117 Mich. 560, 563 (76 N. W. 86).   *   *   *   It was the duty of all the employés engaged at the new laboratory, under the conditions presented at the time, to take note seasonably of things or conditions which ordinary observation would bring to their attention, and which they could see as well as the master could see them.   Hatchways in laboratories and factories are common.   They are there for the purpose of utility and convenience.   To be used they must be opened.   An employé cannot complain of their existence, or of their being left open from time to time, when they are so situated that in broad daylight they will be discovered with the slightest attention.   As well might an employé complain when, through heedlessness, he falls over a box of drugs or a carboy of acid.   He might claim that he was unaware of their presence on a platform, and was not told that they were there.   But the master would have the right to assume that he and other employés working with him would use the senses with which nature had endowed them."

As applied to the facts of this case, we think this contention cannot be sustained.   The platform was not in process of construction.   It was apparently completed.   It was used for unloading goods, and as a way traveled by the employés.   The plaintiff had never been there before.   He was not bound to assume that, upon a platform of this character, he would find an open trapdoor.   He had no occasion to suppose he was likely to drop into an opening

if he did the work he was set to do. Trapdoors are dangerous openings, and, when open, should be properly guarded. See *Engel* v. *Smith*, 82 Mich. 1 ( 46 N. W. 21, 21 Am. St. Rep. 549 ); *Pelton* v. *Schmidt*, 104 Mich. 345 ( 62 N. W. 552, 53 Am. St. Rep. 462 ). The case comes within the principle announced in *Brown* v. *Railroad Co.*, 118 Mich. 205 ( 76 N. W. 407 ), where it was said:

" The plaintiff did not know this. He had been but a short time employed on a boat, and was wholly unacquainted with freight boats, or the custom of leaving the hatchways open on such boats. He was employed as an oiler of engines on the Ann Arbor. He was taken away from his accustomed work, and, if his testimony be true, put into a dangerous place, without warning or caution, by one who stood in place of master. It is true that the rule is well settled that the servant assumes all the risks usually incident to his employment, but this rule cannot be invoked in the present case. His usual work, for which he was employed, was that of oiler, and that on another and different kind of boat. He was taken from that work, and put to do work of another kind. Plaintiff had the right to assume that he would not be put in a position of danger in going upon the boat to aid in fitting her out. *Harrison* v. *Railroad Co.*, 79 Mich. 409 ( 44 N. W. 1034, 7 L. R. A. 623, 19 Am. St. Rep. 180 ); *Engel* v. *Smith*, 82 Mich. 1 ( 46 N. W. 21, 21 Am. St. Rep. 549 )."

It is urged that, if the record discloses evidence of negligence on the part of any one other than the plaintiff himself, it is that of a fellow-servant, not that of the principal; that Olschefski was acting as the eyes for himself and plaintiff as well; and, inasmuch as he saw the trapdoor, it was his duty to warn the plaintiff, and, if he did not, his failure to do so was the intervening cause of the injury, and the defendant is not liable. As before stated, this is not the case of an employé who knew the danger. Plaintiff had never before been on this platform, and did not know of the existence of the trapdoor. The language used in *Cone* v. *Railroad Co.*, 81 N. Y. 206 ( 37 Am. Rep. 491 ), is instructive:

"As between the plaintiff and the defendant, it was the duty of the latter to furnish its employés, for use in the prosecution of its business, good and suitable machinery, and keep it in repair.   *Wright* v. *Railroad Co.*, 25 N. Y. 562; *Laning* v. *Railroad Co.*, 49 N. Y. 521 (10 Am. Rep. 417); *Flike* v. *Railroad Co.*, 53 N. Y. 549 (13 Am. Rep. 545); *Corcoran* v. *Holbrook*, 59 N. Y. 519 (17 Am. Rep. 369).   It was also its duty to furnish, for the management of such machinery, careful and trustworthy servants; and, if these conditions were fulfilled, the plaintiff, although injured by the negligence of his fellow-servant, could maintain no action against their common principal. *Wright* v. *Railroad Co.*, *supra; Coon* v. *Railroad Co.*, 5 N. Y. 492.   But that is not the case here.   The plaintiff was not injured by the negligence of his co-employé while managing good and suitable machinery.   The defendant failed to supply machinery of that character.   *   *   * Therefore the defendant's contention comes to this: 'We concede that we failed in our duty.   We did not supply a suitable machine.   But our servant, the engineer, could, notwithstanding, have so managed that the defect should cause no harm.'   If this doctrine is accepted, it will loosen the rule of responsibility, which now bears none too closely upon corporate conduct.   It will seldom happen that unusual care on the part of an engineer would not prevent an accident.   In this case he might have opened the cocks or blocked the wheels, or, with extreme care, so separated the engine from its train that the two should occupy separate tracks.   It now seems that it would have been well to have done one or the other of these things.   His omission to do so may have been negligence towards the defendant, but it does not remove the responsibility which attached to it, to furnish good and suitable machinery, or place it upon a subordinate, whose duty is to be measured by the degree of skill necessary for its management, and who is not called upon to make good the want of corporate care and attention."

In *Grand Trunk R. Co.* v. *Cummings*, 106 U. S. 700 (1 Sup. Ct. 493), it is said:

"In the instruction which was given we find no error. It was, in effect, that, if the negligence of the company contributed to (that is to say, had a share in producing) the injury, the company was liable, even though the negligence of a fellow-servant of Cummings was contributory

also. If the negligence of the company contributed to, it must necessarily have been an immediate cause of, the accident, and it is no defense that another was likewise guilty of wrong."

See, also, *Ellis* v. *Railroad Co.*, 95 N. Y. 546; 7 Am. & Eng. Enc. Law (1st Ed.), p. 828; *Town* v. *Railroad Co.*, 84 Mich. 214 (47 N. W. 665); *Sheltrawn* v. *Railroad Co.*, 128 Mich. 669 (87 N. W. 893).

Can it be said that the action of the company in constructing this trapdoor, and leaving it open, in the line which must be traveled by plaintiff if he complied with the direction given by the foreman, without informing him of its existence, or putting a guard about it, did not contribute to his injury? It cannot be said it did not.

The judgment is affirmed.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred. LONG, J., did not sit.