NICHOLS *v.* PERE MARQUETTE RAILROAD CO.

1. MASTER AND SERVANT—INJURIES TO SERVANT—DEFECTIVE APPLIANCES—NOTICE OF DEFECT.

No negligence, arising from failure to properly inspect a ladder leading to the top of a railroad water tank, is shown, where it appears that the ladder had been in use for upwards of twelve years, that it was properly inspected six months before it broke, that it broke from concealed rot not discoverable by ordinary inspection, and there is nothing to show the nature of the wood used in its construction, nor how long it might be expected to resist decay, nor how fast decay, once started, would progress.

2. SAME—DISCOVERABLE DEFECTS—CONTRIBUTORY NEGLIGENCE.

In an action for damages occasioned by plaintiff's fall from a wooden ladder on a water tank, evidence examined, and

*held*, that whether the defect in the ladder from which it broke was obvious and discoverable by the ordinary care required of one using it was for the jury.

3. SAME—DEFECTIVE APPLIANCES—DUTY TO INSPECT.
It cannot be said, as a matter of law, that a 35-foot ladder attached to a water tank, only occasionally used, is a common tool or appliance within the rule which exempts the master from the duty to inspect them upon the presumption that those using them will, and should, first discover defects.

Error to Ingham; Wiest, J. Submitted May 1, 1906. (Docket No. 132.) Decided September 20, 1906.

Case by Jeremiah Nichols against the Pere Marquette Railroad Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Reversed.

A water tank belonging to defendant company, located at Fowlerville, was reached by a vertical ladder about 35 feet long, leading from the ground, fastened to the tank. There was a steam pumping station connected with the tank, and on the tank an indicator designed to show the depth of the water therein. Plaintiff is an engineer by profession, and for a number of years had been employed by defendant at different times, and had been in charge of such plants at various points along the road, including the plant at Fowlerville. On January 2, 1904, he was sent to fill the tank at Fowlerville, taking the place there of one McCormick, who was ill. On the morning of the 3d of January, plaintiff discovered that the indicator, on account of an accumulation of ice, was not in good order, and he went up the ladder for the purpose of learning how much water there was in the tank. The next day, January 4th, he went again to Fowlerville, from Williamston, where he lived, to fill the tank, and again climbed the ladder to ascertain the state of the water. When he descended the ladder, a slat or rung of the ladder gave way, and he fell to the ground. He sustained injuries, and brought this suit. There was a verdict and judgment in

his favor.   In this court, it is contended that the circuit
judge should have directed a verdict for defendant (as he
was requested to do) because (1) the plaintiff failed to
make out a case of negligence on the part of the defend-
ant; (2) the undisputed testimony shows that the defect,
the cause of the injury, was a risk of the employment as-
sumed by the plaintiff.

It is not alleged that the ladder was unsafe when con-
structed, and the jury were told that the original construc-
tion was proper, and that the claim of plaintiff was that
it was not kept in reasonable repair, and that reasonable,
suitable inspection would have disclosed the need of repair.
Defendant's foreman of water service inspected the pump-
ing station at Fowlerville July 2, 1903.   He testified:

" I ascended the ladder, and tried the rounds as I went
up and also sounded for defective places which might not
be visible, sometimes in old ladders and buildings, some-
times the paint covers over and makes a coating and that
might be hollow inside, and still not visible to the eye, in
such cases we sound them to see if we can find any de-
fects.

" *Q.* After making that inspection, what was your
opinion as to the condition of that ladder ?

" *A.* That the ladder was safe."

On cross-examination, he testified that the ladder was
not new, but he did not know how old it was.   (It was
constructed of side timbers 5½ by 1¾ inches in size, set 18
inches apart, fastened to the tank, and on the outer narrow
face of each timber notches or gains ½ inch deep and 3
inches wide were cut.   In these gains, the slats or rungs
2¾ inches wide and ¾ inch thick were nailed.)   He further
testified:

" *Q.* And wasn't even gained in the full width, the full
thickness of the slats, was it ?

" *A.* Hardly, nearly so.

" *Q.* A man in climbing up that ladder taking hold of
the slats, it would throw his whole weight they would
be pulling off all the time ?

" *A.* Yes, sir.

" *Q.* In other words, it would be just the opposite of a leaning ladder where he would be pushing down upon it?

"*A.* There would be a difference there.

" *Q.* Now, the only examination you made was to look at it and climb up it and tap it, what did you tap it with?

"*A.* I tapped it with—I could not say what I used at that time, a hammer, I think.

" *Q.* You recognize the fact that timber and ladders exposed are liable to get out of order, don't you?

"*A.* Yes, sir.

" *Q.* They are apt to get old?

"*A.* Yes, sir.

" *Q.* The weather affects them?

"*A.* Yes, sir.

" *Q.* They become rotten, you say, where you cannot see them?

"*A.* Yes, sir.

" *Q.* And that is the reason you tap them, because they conceal rots?

"*A.* Yes, sir.

" *Q.* Now a ladder of this kind is more liable to get rotted inside of the gains, than anywhere else, isn't it; there is a crack there where the water runs in, it is more liable to rot there than anywhere else, ain't it?

"*A.* I think so.

" *Q.* And if a ladder of that kind standing perpendicular and with nails of this kind should become rotten inside of the gains there would be more liability of the slats pulling off if a man wanted to climb it, wouldn't there?

"*A.* If the ladder is old enough and it gets rotten enough it will certainly pull off."

The defendant's inspector of buildings inspected the tank and ladder June 1, 1903, going up the ladder to the top of the tank, taking hold of and using each one of the rungs. He was at the time at Fowlerville to examine a sidewalk, and took occasion to go over the water tank. He found the ladder in good condition, and did not find any of the rungs of the ladder in any way loosened. The slat which gave way was shown to him, and the following testimony was given:

" *Q.* Did you notice these slats were simply held by nails?

" *A.* Yes, sir.

"*Q*. That a man climbing and having hold of the slats would be pretty apt to fall if the nails gave way?

"*A*. Yes, sir.

"Thereupon counsel for plaintiff handed witness the slat, Exhibit 1, which gave way with the plaintiff, and continued the cross-examination as follows:

"*Q*. What would you say about the safety of that sort of a slat, look at the holes and nails?

"*A*. The slat looks all right.

"*Q*. It looks all right to you as a safe slat, held by nails?

"*A*. No; not very, no, sir.

"*Q*. Did you observe that it was not safe at the time you investigated?

"*A*. No, sir; the slat was fastened on with nails, of course.

"*Q*. Would you say that was an old defect of long standing?

"*A*. No, sir; part of the slat is rotten, a part sound.

"*Q*. You think it is recent?

"*A*. In the last year or so when it was on there.

"*Q*. Oh, within the last year or so when it was on the ladder, then would you say that defect existed at the time you tested it?

"*A*. I cannot say.

"*Q*. What would be your opinion as an expert in wood?

"*A*. That it was defective."

The witness McCormick, who had been in charge of the pumping station, testified that he used the ladder in the latter part of December, 1903, because the indicator was frozen, and discovered, about December 18th, that the first slat below the platform on which the tank rested was loose at one end. "I noticed it when I went up; I caught it with my left hand, and it kind of give, and I noticed it was loose." He intended to repair it but forgot it. He did not repair it, or report it. It was this slat which plaintiff pulled out. A son of plaintiff testified that two days after his father was injured he was employed by defendant to take his father's place as pumper; that he examined the ladder, and discovered that the nails which held the slat had pulled out of the timber on the west side of the ladder where there was a spot of decayed wood an inch

long and three-quarters of an inch wide, in the center of
the timber; that when the slat was up, the decayed por-
tion was behind the slat; that with this exception the lad-
der looked all right.    There was testimony tending to
show that the ladder had been in position for from 12 to
15 years.    I find no evidence of periodical inspection of
such property or of any rule of the company upon the
subject.    There is evidence of supervision, by the fore-
man of the water service whose duty it is to see that the
water tanks and pumps are in condition, by the carpen-
ters who inspect all plants, by the supervisor of buildings
who looks after the maintenance of all buildings, water
stations, and coal trestles.    It does appear that the man in
charge of a pumping plant is required to report, and, if he
can, repair, breakages.    Plaintiff had at one time been in
charge of the plant at Fowlerville, but had never used the
ladder.    It was his opinion and his knowledge, so far as
he had knowledge, that the ladder from which he fell had
been maintained for upwards of 12 years.    He had worked
at carpenter work for many years, and knew the effects
of the weather upon timber.    There is also this testimony
of the witness McCormick:

"The first time I went up I was very careful about the
ladder.    It was a little shaky and it is quite a little ways
for a man of my age to go up there."

And the defendant's inspector of buildings when he in-
spected the ladder in the summer discovered that it had
been loosened from the tank and refastened by using wire
around the tops of the timbers and over the roof.    He did
not repair it.

*F. W. Stevens* (*Thomas, Cummins & Nichols,* of
counsel), for appellant.

*Trask & Cairns* (*Person & Person,* of counsel), for
appellee.

OSTRANDER, J. (*after stating the facts*).    1. Does the
testimony to which reference has been made present a

question of law or of fact upon the subject of the negligence of defendant?

It is assumed that the plaintiff in rendering proper service to defendant was required to use the ladder. The ladder was an instrument of such service, provided by the master. The law requires that the master shall use ordinary care and diligence to provide safe instruments of service. When, as in this case, such care is originally exercised and the default charged is in maintenance, it must, generally, be made to appear that the master had actual or constructive notice of the particular defect complained of. The master is held generally to have constructive notice of whatever ordinary care and diligence would discover. He is not liable to a servant for defects of which he had no notice and which ordinary care would not discover. It is not claimed that the defendant had actual notice of the particular defect. So far, then, as the defendant's negligence is concerned, plaintiff's case rests upon the theory of a constructive notice and this upon the failure to properly inspect or to inspect at proper intervals of time. The case is even narrower. It is not claimed by plaintiff that in July, 1903, the particular defect was obvious. Indeed, it is denied that there was an obvious defect when plaintiff used the ladder. He testified:

"There was not anything either time I went up the ladder to attract my attention to any danger—the ladder was painted—I cannot tell why I did not pull the slat out when I went up unless it was that I happened to take hold on the right side where the nails held. The slat set in notches and in stepping on it it might have held unless it was stepped on in a certain way. I had no notice of the ladder being defective in any way."

Counsel for plaintiff say in the brief:

"No man could see that the nails had rusted off, or that the wood they went into had rotted."

Plaintiff's case rests, therefore, upon the alleged failure to discover such, if any, concealed unsound condition as existed in July, 1903, and upon failure to repeat, within

six months, the inspection. Upon neither of these points is there testimony tending to show negligence of the defendant. The nature of the wood used, how long it might be expected to resist decay, how fast decay, once started, would progress—none of these facts appear. Assuming that the age of the ladder, its exposure, the defect discovered, raised the presumption of negligence on the part of defendant in the absence of proper inspection of the ladder, it appears that it was inspected in June and in July, 1903, in manner already described. The character of the inspection which the master is bound to make, where failure to inspect would be evidence of negligence, is variously stated in the opinions of courts and in the text-books. It may be described as such as a person of ordinary prudence would have made under the circumstances. 1 Labatt on Master and Servant, § 161. Going along with this idea of a standard of inspection is the further one that the tests shall be "such as are usual and ordinary in the business," "such tests as custom and experience have sanctioned," "usual tests," "ordinary inspection," "careful and skillful application of the ordinary and approved tests,"—all of which descriptive terms have been used by courts. Whether the examination which is made conforms with the standard is usually a question for the jury. Labatt on Master and Servant, § 161, and notes. This does not mean, however, that juries may act upon conjecture, or that courts are bound, without regard to the state of the evidence, to ask juries to determine whether a proved inspection was proper inspection, or whether inspections were made as frequently as they should have been. Without in any respect resting the ruling upon a presumption that an inspection made is properly made, there is, in this case, no conflict of testimony upon the subject. Nor may two opposed inferences be reasonably drawn from the facts. The appliance was simple, could be looked at and examined from all sides, was not, like active machinery, worn out by use or subjected to strains. That the inspection

made satisfied a proper standard of inspection, is not disputed by testimony; it was according to the custom of defendant. No one assumes to say that any reasonable test would have discovered, in July, 1903, such defect, if any, as then existed. The inspection which was made having discovered no defect, that six months intervening inspections was too long an interval is not shown by any testimony. It is not claimed that what is wanting in the testimony is supplied by common knowledge and experience of men. In saying this, we have not overlooked a certain concession of counsel for defendant, made at the trial.

The case is to be distinguished, upon the facts, from *Howe* v. *Railroad Co.*, 139 Mich. 638, in the following important particular: It appeared in that case that the safety of the floor depended upon the soundness of the nails used in the stringers which supported it. These stringers were toe-nailed. There was testimony that the nails were rusted off when the floor gave way a few weeks after the inspection. The inspector did not see the nails, though he knew of the particular construction. It was held that it could not be said, as matter of law, that proper inspection of the building did not require an examination of these nails to see if they were rusted off, the building having been erected some 15 years prior to the injury of plaintiff.

2. As the case must go down for a new trial and upon such trial the evidence of defendant's negligence may be more complete, it is necessary to notice the further contention made for defendant. Various approved rules of law are stated in the brief; their application to the facts is questionable. We are satisfied, for example, that whether the defect in the ladder was obvious or discoverable by the ordinary care required of one using the ladder was for the jury. We are as well satisfied that the duty of plaintiff to inspect the ladder cannot be said to have been established. So far as the argument proceeds upon the theory that the simplicity of the appliance determined,

conclusively, the risk assumed by plaintiff, it is believed to be not well supported. Undoubtedly, the degree of care exercised by McCormick would have saved plaintiff from injury. We are not disposed to hold that a 35-foot ladder attached to a water tank, only occasionally used, is a common tool or appliance within the meaning of the rules which exempt the master from the duty to inspect them upon the presumption that those using them will, and should, first discover defects. It is true that in the case at bar the plaintiff knew the age and the exposure of the ladder as well as did the defendant. But we think it cannot be said that all defects arising from age or decay, which ordinary inspection for the purpose of inspecting would discover, would necessarily or probably be discovered or discoverable by a servant in its use, even if due care on his part was exercised. *Twombly* v. *Electric Light Co.*, 98 Me. 353 (64 L. R. A. 551).

The judgment is reversed, and a new trial granted.

CARPENTER, C. J., and MCALVAY, BLAIR, and HOOKER, JJ., concurred.