## KLEINFELT v. J. H. SOMERS COAL CO.

1. MASTER AND SERVANT — DEATH — NEGLIGENCE — NEGLECT OF STATUTORY DUTY—ASSUMPTION OF RISK.

   Where the statute imposes a duty upon the employer for the protection of the employé, an injury from the neglect of this duty is not a risk assumed by the employé.[1]

2. SAME.

   Under section 3, Act No. 100, Pub. Acts 1905, providing that only competent and trustworthy engineers shall be permitted to operate cages and hoisting devices in coal mines, the master is not entitled to notice of the incompetency of a fireman so employed; since by the very employment the master neglected a statutory duty.

3. SAME—DEATH—PROXIMATE CAUSE—NEGLIGENCE — CONCURRING NEGLIGENCE OF MASTER AND FELLOW-SERVANT—LIABILITY.

   Where, in such action, if one of the proximate causes of the

[1]As to servant's assumption of risk of master's breach of statutory duty, see note to *Denver, etc., R. Co.* v. *Norgate* (C. C. A. 8th C.), 6 L. R. A. (N. S.) 981.

injury was the act of the fellow-servant, still the master would not be relieved from liability if it neglected the performance of duties imposed by the statute; since, where an injury results from the fault of the fellow-servant, concurring with that of the master, both may be liable.[1]

Error to Saginaw; Gage (William G.), J.  Submitted January 20, 1909.  (Docket No. 74.)  Decided April 30, 1909.

Case by Ida Kleinfelt, administratrix of the estate of Otto Kleinfelt, deceased, against the J. H. Somers Coal Company for the negligent killing of plaintiff's decedent. There was judgment for defendant on a verdict directed by the court, and plaintiff brings error.  Reversed.

*J. P. Devereaux* and *Vincent & Nash* (*R. L. Crane*, of counsel), for appellant.

*Fred L. Vandeveer* (*W. J. Lamson*, of counsel), for appellee.

Montgomery, J.  This action was brought to recover for damages resulting to the estate of Otto Kleinfelt by negligently causing his death in one of defendant's mines at St. Charles, Mich., October 24, 1905.  At the close of all the proofs, the court directed a verdict for the defendant.  It becomes necessary therefore to determine whether there was any testimony offered on behalf of the plaintiff which fairly tended to show facts from which a liability could be drawn.

The defendant's mine was about 195 feet deep, and miners and others customarily entered and departed from the mine by means of cages operated in the main hoisting shaft.  These cages were raised and lowered by means of cables attached to drums operated by the hoisting engine

---

[1] As to the relation of the proximate cause doctrine to the rule of liability of a master for injuries to his servant caused by combined negligence of himself and a fellow-servant, see note to *Lutz* v. *Atlantic, etc., R. Co.* (N. M.), 16 L. R. A. 819.

at the surface, and so arranged that while one cage was ascending the other was descending. The cages used for hoisting coal were the same cages upon which the men were carried. The cage upon which the accident occurred was 6 or 7 feet long and about 4 feet wide. It was open at the two ends, but on the sides a piece of sheet iron extended upwards about 3 feet from the floor. Upon the floor there were laid two tracks lengthwise of the cage, upon which the cars of coal were run. In the middle portion of these tracks, the sections of the floor upon which they were fastened were so constructed that, as the cage started upward from the bottom of the shaft, these sections, each 6 inches wide by 2 feet long, would drop down from 6 inches to a foot, for the purpose of allowing the car wheels to settle down, and thus hold the car securely in place. These sections dropped down as described when no car was being hoisted. Overhead a trip bar extended across the cage from side to side, so placed that it was about 18 inches from one end. This bar was about 1½ or 2 inches in diameter, and was placed upon the cage for the purpose of dumping it. Where this trip rod was there were also two rollers which held that part of the cage level. The height of the cage was about seven feet. Running from the ends of the trip rod downwards were braces placed outside of the sheet iron sides. At the top of the cage, hinged near the middle, were two covers or lids of sheet iron, the purpose of which was to prevent falling objects from striking persons in the cage. The inside of the shaft was lined from top to bottom with squared timbers or buntings, so laid that there was alternately a timber, then a space, and so on. The cage ran up on guides inside these timbers, and with a very narrow space between the floor of the cage and the inside faces of these timbers.

On the date in question plaintiff's intestate, who was a miner in defendant's employ, was down in this mine breaking down coal for removal the following day. He was accompanied by his son, Gus Kleinfelt, a boy between

12 and 13 years of age. About dinner time Kleinfelt and his son and an Italian miner started to walk out towards the shaft to go to the surface. On their way they met the superintendent of the mines, John T. Phillips, and the foreman of this mine, No. 3, Hugh McKenna, Sr., and another man named Alexander, who were working at a pumping engine. Mr. Kleinfelt spoke a few words with Mr. McKenna, and the latter directed him to hurry up and get on the cage. Mr. Kleinfelt, his son, and the Italian immediately went to the cage, got on, and the cage started to go as soon as they got on. Upon this cage when it started to ascend was Clarence Curtis, who was the regular engineer, having in charge the hoising engine at the surface, but who was then doing work in connection with fitting up the pumping engine, also Sidney Traver, helper to the master mechanic, and Kleinfelt, his son, and the Italian. There was also placed upon the cage by Curtis and Traver a piece of iron pipe $1\frac{1}{4}$ inches in diameter and 14 feet long, which they had brought from the pumping engine where they had been working under Phillips and McKenna, and which they were taking to the surface to have recut. Curtis had raised one of the sides of the lid or hood and stood it up against the cable. He then passed the pipe up through the top of the cage alongside of the lid, with the lower end resting on the floor of the cage. The lid was not fastened in any way, but merely stood up in a vertical position against the cable. He then, during the ascent, held the pipe with his hand. Mr. McKenna knew that the pipe was about to be taken in this manner. Gus Kleinfelt, who was at the side of his father during all of this time, testifies that he did not see the pipe until after he was on the cage. The cage ascended with great rapidity, so that the lights on the caps of those in the cage were all extinguished immediately after starting, leaving the cage in total darkness. It appears that the hoising engine was at this time in charge of one George Tigner, who was not employed as an engineer, but as a fireman. There was some testi-

mony that his reputation was bad as to speed in handling the cage.   When the cage had reached a point about 40 feet from the surface, there was a great rattling and shaking of the cage and an outcry by the men, and the cage came to a stop in about 15 feet.   All of those on the cage, with one exception, were thrown down flat on the bottom of the cage.   They got up when the cage stopped and climbed to the surface, up the buntings or timbers.   They found the lid or cover, which Curtis had stood up against the cable, fallen over in its usual horizontal position, and had to push it up again in order to crawl out.   When a light was taken into the cage, it was found that the end of the pipe was stuck into a timber at the side of the shaft, and the pipe was curved around inside of the cage.   The two ends of the pipe were 18 inches or 2 feet apart; the platform of the cage being past the timber in which the top of the pipe was caught about 15 inches.   Mr. Kleinfelt's body was found between the timbers; the bottom of the cage having come up past his head and shoulders, and he being crushed to death.   Life was extinct before he was found.   There were no bars or rings placed on this cage to furnish handholds for passengers thereon.

The plaintiff charges the defendant with negligence: In failing to have this cage in the mine fitted with iron bars or rings in proper place, as required by section 15, Act No. 100 of the Public Acts of 1905; in permitting a fireman to operate the cage and hoisting device, contrary to the provisions of section 3 of the same act; in directing the deceased to go upon the cage at the same time that a pipe 14 feet long and $1\frac{1}{4}$ inches in diameter was to be carried; in allowing said pipe to be carried on the cage together with deceased and other passengers; and in not providing a proper catch or safety device for holding the lid at the top of the cage in a vertical position.

The statute (Act No. 100, Pub. Acts 1905) provides, in section 3:

"That only a competent and trustworthy engineer

shall be permitted to operate the cages and hoisting de-
vices in all coal mines (any coal mine) of this State."

By section 15 it is provided:

"Every cage on which persons are carried must be
fitted up with iron bars or rings in proper place, and a
sufficient number to furnish a secure handhold for each
person permitted to ride thereon."

That the testimony offered on the part of the plaintiff
tended to show a neglect by the defendant of each of the
duties defined by these two sections, is beyond controversy.
It is also settled in this State that, where a statute im-
poses a duty upon the employer for the protection of the
employé, injury from the neglect of this duty is not one
of the risks assumed by the employé. See *Sipes* v.
*Starch Co.*, 137 Mich. 258; *Murphy* v. *Grand Rapids
Veneer Works*, 142 Mich. 677; *Swick* v. *Cement Co.*,
147 Mich. 467; *Layzell* v. *J. H. Somers Coal Co.*,
ante, 268. It is suggested that the passenger might
have caught hold of the braces or trip rod or sheet iron
sides to protect himself, but it is not clear that it would
not have been an act of negligence on his part to have
caught hold of some of these places. It certainly would
have been a great inconvenience for a man of the height
of deceased to have reached the trip rod, and it does not
appear that the miners were accustomed as a rule to re-
sort to these makeshifts. It was at least a question for
the jury as to whether there was a neglect to comply with
the statutory provision of providing rings or bars in the
proper place to furnish a secure handhold.

The circuit judge seems to have been of the opinion
that any fault of the fireman would be a fault of a fellow-
servant of the defendant, unless notice of his incompe-
tency was brought home to the company. This view
ignores the fact that the fireman was not of the class of
mechanics who, under the statute, are authorized to
operate hoisting engines such as these, and, this being so,
the deceased did not assume the risk of his incompetency.

No notice was required to the company of his incompetency, as in his very employment the company had neglected a statutory duty.

It was also the view of the circuit judge that there is no evidence that would indicate that, had the handles been there, this accident would not have happened. It was in evidence that when the crash came all the employés of the cage were thrown violently to the floor of the cage. It was open to inference that, had handles been provided, and had they been in use, this would not have happened, and it might very well have been found by the jury that the death of this decedent might have been averted had these provisions been made. This being so, the most that can be said upon the question of proximate cause is that the presence of this rod might have been a cause of the crash, and that its presence may be said to have been the fault of the fellow-servant; but, if this be so, there were concurring acts of the fellow-servant and negligent acts of the employer in intrusting its hoisting device to one not an engineer who was running the car at great speed, and the failure to provide handles which might have enabled the deceased to avert the injury which came from the concurring fault of the co-servant. The rule is that, where an injury results from the fault of the fellow-servant, concurring with that of the master, both may be liable. *McDonald* v. *Railroad Co.*, 108 Mich. 7; *Hayes* v. *Stearns & Co.*, 130 Mich. 287; *Lockwood* v. *Tennant*, 137 Mich. 305. To say that the proximate cause of the injury, in the absence of handholds, is something other or different from that neglect of duty, would be practically to render this statute of little value to employés. The occasion for the handhold arises only when an accident occurs, either unforeseen or through the fault possibly of a fellow-servant. It is in this emergency that the handhold is of some value to the employé, and undoubtedly it was with the view of meeting this emergency that the legislation was enacted. It would not meet the purpose of the legislation if the courts

should say that it would be impossible to offer direct proof that had the handholds been provided the injury would not have happened, and that therefore no recovery could be had.

The judgment will be reversed, and a new trial ordered.

BLAIR, C. J., and GRANT, MOORE, and BROOKE, JJ., concurred.