DELBUSSO *v.* AMERICAN CEMENT PLASTER CO.

1. MASTER AND SERVANT—ELEVATORS—GATES—MINING — GUARD-
   ING DANGEROUS OPENINGS.

    Act No. 113, Pub. Acts 1901, requiring manufacturing corpora-
    tions to provide automatic gates for elevators, does not apply
    to an elevator in the mine of a corporation, organized under
    the laws of Kansas, and engaged in both mining and manu-
    facturing in this State.

2. SAME—SYSTEM OF OPERATING ELEVATOR—NEGLIGENCE.

    Whether it was negligence to install an elevator, the signal for
    which was operated by ringing, from the different points at
    which it would stop, a bell located in the engine room, there-
    by notifying the engineer to start it, although he could not
    tell that it was then safe to do so, presented a question of
    fact for the jury, in an action brought to recover for the
    death of an employé who was caught by the starting of the
    elevator while he was alighting.

3. SAME—ASSUMPTION OF RISK — QUESTIONS OF LAW AND FACT —
   DIRECTING VERDICT—CONTRIBUTORY NEGLIGENCE.

    And it was a question of fact whether or not plaintiff's intes-
    tate was so familiar with the facts and so capable of appre-
    ciating the danger, that he assumed the risk, or was guilty
    of contributory negligence.

4. SAME.

    It is not enough that a servant knows the fact of certain
    dangers, to charge him with the assumption of risk; he must
    know and understand the danger, or the danger must be so
    obvious that his appreciation of it is a necessary inference.

5. SAME—IMPLIED CONTRACT—PRESUMPTION.

    An employé may expressly agree to assume the risk of his em-
    ployer's neglect, where it is permissible, or a contract to as-
    sume such risk may be inferred from the circumstances, but
    there is no presumption that he assumed the risk by his con-
    tract of hiring.[1]

6. SAME.

    And while he is bound to take notice of apparent conditions,
    he is not necessarily bound to know that they are dangerous.

[1] On the question: May servant assume the risk of dangers cre-
ated by the master's negligence, see note in 28 L. R. A. (N. S.) 1215.

Error to Kent; Perkins, J.   Submitted February 23, 1911.   (Docket No. 48.)   Decided March 31, 1911.

Case by Eliza Delbusso, administratrix of the estate of Anthony Delbusso, deceased, for the negligent killing of plaintiff's intestate.   A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error.   Reversed.

*Dunham & Phelps* and *Lombard & Hext*, for appellant.

*Keena, Lightner & Oxtoby* and *Charles E. Ward*, for appellee.

HOOKER, J.   The defendant is a Kansas corporation engaged in this State in the business of manufacturing cement and other products from gypsum, which it mines through a shaft about 75 feet deep.   The gypsum was raised from the mine on an elevator, being in carts or barrows, which were rolled from the elevator in the shafthouse, and thence through a covered way to a building about 20 feet distant, where it was transformed into cement and other products.   The elevators were platforms, one being attached to each end of a wire cable which passed over and around a drum, operated by an engine situate on the second floor of the shafthouse in charge of an engineer.   When one elevator was at the second floor of the elevator building, the other was at the bottom of the shaft.   It was usual for the men to be taken down into and brought from the mine on these elevators, from and to the first floor of the building.   When one elevator was at the first floor, the other was some 20 feet above the bottom of the shaft.   The engineer was signaled by a bell, a wire extending to the bottom of the shaft, and accessible from the elevator at the first floor, being used for ringing the bell by pulling the wire.   The control of the bell from the bottom of the shaft was confided to a man employed for the purpose, with instructions

to permit no other man to touch it. The elevators had gates at the shafthouse which closed by gravity, and were raised and held up by the men while they passed under them. Plaintiff's husband, the intestate, was an Italian, and with others came up on the skip to the first floor, and, after many had passed under the gate, took hold of it and attempted to go off from the elevator, when the bell rang the signal for the elevator to go up to the second floor. It was immediately started, the gate fell upon the man, and after the elevator passed him he fell to the bottom of the shaft, and was killed. Two men remained on the elevator.

Negligence is charged against defendant:

*First.* For failing to comply with the statute by providing automatic gates.

*Second.* For failing to furnish a safe elevator by providing a proper device for signaling the operator.

That the signal was given is not disputed, but the men on the elevator and those at the bottom of the shaft who were waiting for an elevator to take them up all denied that the bell was rung from their respective points. A verdict was directed for the defendant; the learned circuit judge being of the opinion that the statute did not apply to this elevator; that the elevator and bell were all in good order; and that the defendant was not negligent in placing the engineer where he could not see the elevator when it was at the second floor; but that in any event the deceased was familiar with the appliance and assumed the risk.

Two errors are assigned, viz.: *First*, in holding that defendant was not negligent; *second*, in holding that deceased assumed the risk.

### Defendant's Negligence.

(*a*) *The Statute.* There is no question that the defendant was engaged in the business of a manufacturer. It is also plain that it was engaged in mining. It appears to be conceded that, if this were a mining corporation en-

gaged wholly in mining, the statute would have no application; if a manufacturing corporation engaged in manufacturing only, the statute would apply.

The plaintiff insists that, inasmuch as the defendant manufactured the product which it mined, it should be held that the manufacturers' law should apply to the whole plant. We do not see why it would not be as reasonable to say that, inasmuch as it carried on the business of mining, the statute regulating mines should apply to the entire plant. It is contended that it should depend upon the law under which it was incorporated, or the purposes stated in its articles. It is also suggested that the secretary of State in filing articles must determine and certify which law is applicable, but in this case the defendant was not organized under any Michigan law, nor has it filed its articles in Michigan.

There would be a manifest impropriety in applying one or the other of these laws to a particular corporation, if the effect were to be to relieve it from providing the safeguards required by the character of the business in which it should engage as protection against the dangers which the legislation was intended to prevent. To so hold, or to say that the opinion, or official act of the secretary of State, or its own choice of laws under which it organized, must control, would put a premium upon selecting an inappropriate act under which to organize for the sake of immunity from the requirements of the act appropriate to the business actually intended. If we could properly legislate on this question, we might think the provisions of the manufacturers' act as to elevators a proper one to be applied to mine elevators; but we have no such authority, and the legislature has apparently taken a different view. We must either say that the mining part of this business is governed by the manufacturers' act, to the exclusion of all of the mining law, or the converse. This corporation is engaged in mining and also in manufacturing. The plants are separate and distinct though closely adjacent

165 MICH.—21.

and connected. The workmen are entitled to protection against the particular dangers of the business in which they are respectively engaged, manufacturers under the manufacturers' laws, and miners under the law pertaining to mines, made and provided in accordance with the judgment of the legislators. We should be careful in applying the proper rule, lest in an effort to mitigate the hardship of one case we make a precedent which will result in injustice in others. We are of the opinion, therefore, that the safer rule for all cases is that the manufacturers' statute does not apply to a mine elevator, and therefore defendant was not negligent in omitting to comply with that statute.

(b) *Safe Machinery.* No complaint is made of this elevator plant, except in regard to the protection against inopportune signals, either by some other method of signaling, or by so locating the engineer that he could at all times see whether there was danger at the lower floor before obeying the signal. We are not concerned with either proposed remedy, but only with the question of reasonable safety of the course adopted. The light afforded by this accident makes plain a danger attendant upon attempting to operate an elevator which may be set in motion at will by different persons from different places. Whether this bell was rung by some one at the bottom of the shaft, impatiently waiting its ascent, so that the other might come down, or by one of the two remaining on the elevator, animated by a desire to go to the second floor as men sometimes did, cannot be told. It may have been the latter; the signal having been given prematurely in the expectation that deceased would be off before it started. Again, there is the improbable possibility that it was done maliciously. That the signal to go up was given, admits of no doubt, and apparently it is certain that it was the act of one of deceased's fellow-servants at one of these two points. We must conclude, therefore, that, to hold defendant liable for this injury, it must be found to have been its duty to arrange for the opera-

tion of this elevator in some way that would protect passengers from the danger of its being started from different points, when the person causing it to start had no means of knowing whether it would be attended with danger. It is always easy to see how danger could have been avoided after an accident has happened, and equally easy to conclude that a failure to anticipate and provide against the danger was negligence, and doubtless many reasonably safe machines and methods have been held unsafe where they ought not to have been, under the law. On the other hand, it does not follow that particular dangers should not be anticipated. A rule of reasonable provision for safety is required, and in this case we think it was for the jury to say, in the light of the evidence, whether it was ordinary prudence to provide a signal which might be operated as suggested above. We are of the opinion that this ground for plaintiff's action is sufficiently set up in the declaration. The question is, Was this a reasonably safe provision for the operation of that elevator, under all the circumstances and the general custom of operating such elevators?

## Assumption of Risk.

It is a well-settled rule, and nowhere better settled than in Michigan, that an employé assumes the ordinary dangers of his employment and the risks of defective machinery and methods known to him, or so obvious that he should have known them. It is not, however, the law that the employé must make a minute investigation of machines and methods to ascertain, though he does owe caution and care in these respects.

In this case it may now seem that every one should have foreseen this danger if he knew that the signal could be given from both points, and that neither the man who should give it nor the engineer had any means of knowing whether it would be safe to start the elevator. If decedent was familiar with all the facts and was capable of understanding and appreciating the danger, it may be

that it should be said that he assumed the risk, or was equally negligent with the master.

Assuming (for the argument only) that the defendant should be held negligent in not providing the elevator with a reasonably safe appliance and method of signaling the engineer, thereby subjecting his employés to extraordinary dangers, there is no presumption that the employés assumed the risk by the contract of hiring. It may be expressly so agreed, where such a contract is permissible, and it may be inferred from circumstances.

It is said in 1 Labatt on Master and Servant, § 271:

"An extraordinary risk, it is said, is not assumed unless it is, or ought to be, known to and comprehended by the servant; or—as the same conception may also be expressed in logically equivalent terms—where the servant is chargeable neither with an actual nor a constructive knowledge and comprehension of the risk."

In 1 Labatt on Master and Servant, note to section 271, it was said:

"The general rule that a workman assumes the risks incident to his employment when he enters upon it, is well settled, but its application is subject to certain qualifications. He certainly has the right to expect his employer to provide machinery, tools, and appliances that are reasonably safe for his use, and he assumes no risks growing out of their defective character, unless he has been fully advised that they are defective and dangerous. He has the right to suppose that his employer has provided such guards and means of protection from injury, in the use of the machinery, tools, and appliances as are usual and reasonably necessary for his safety; and he cannot be held to assume the risks attendant on their absence, unless such absence is apparent, or his attention has been called to it. *Rummel* v. *Dilworth, Porter & Co.*, 131 Pa. St. 509 (19 Atl. 345, 17 Am. St. Rep. 827). * * * If the plaintiff did not appreciate the danger of the work he was doing, arising from the defective appliances, and if the defendants were not justified in supposing he understood it, it can not be held that, in the contractual relation of master and servant, he assumed the risk which resulted in his injury. *Demars* v. *Manufacturing Co.* (1892), 67

N. H. 404 (40 Atl. 902). A servant does not assume the unusual and extraordinary risk of which the master knows or which he should know or foresee, unless such risks are obvious, or the servant has actual, or presumptive knowledge of the danger. *Reed* v. *Stockmeyer* (1896), 20 C. C. A. 381, 74 Fed. 186, 34 U. S. App. 727. A servant does not assume the danger from the failure of the master to exercise reasonable care to provide safe machinery and appliances, or a safe place in which to do his work, unless the danger is obvious, or he can acquire knowledge thereof in the exercise of ordinary care. *Comben* v. *Stone Co.* (1896), 59 N. J. Law, 226 (36 Atl. 473)."

This involves the capacity and understanding of the servant, the nature of the defect, the obviousness of the same, and consequent danger.

The author hereinbefore quoted sums up the rule in section 274:

"The doctrine that a servant who has no knowledge, actual or constructive, of an extraordinary risk, is not chargeable with its assumption (see section 271, *supra*) is applied in every jurisdiction in which the principles of the common law are recognized. The logical converse of this doctrine, viz., that a servant is to be regarded as having assumed any extraordinary risk of which he had or ought to have obtained, knowledge, before his injury was received, was also applied universally until comparatively recent times (see section 280, *infra*) and is still the prevailing rule of law in the United States.

"The effect of the operation of this doctrine with reference to a servant's inability to maintain an action may be formally stated thus: A servant who, either before or after he commences the performance of the contract of employment, has ascertained, or ought, in the exercise of proper care, to have ascertained, that the ordinary hazards of his environment have been augmented by abnormal conditions produced by the negligence of his master or of his master's representative, and has accepted or continued in the employment without making any objection and without receiving any promise that the abnormal conditions will be remedied, is deemed, as a matter of law, to have assumed the risk thus superadded, and to have waived any right which he might otherwise have had to

claim an indemnity for injuries resulting from the existence of that risk."

See, also, Id. § 274*a*.

It is not enough that a servant know the fact of certain conditions. He must know and understand the danger, or the danger must be so obvious that his appreciation of it is a necessary inference. See 1 Labatt on Master and Servant, § 279*a*, and notes.

" To bring a case within the scope of the doctrine now under discussion, it must be shown that the servant possessed a sufficiently exact appreciation of the nature and extent of the danger in question to enable him to estimate the possibilities of his environment in so far as they affected his bodily safety. The absence of that appreciation is logically incompatible with the hypothesis that, in undertaking or continuing in the employment, he exercised that intelligent and deliberate consent which is one of the essential elements involved in the conception of an assumption of a risk.

" ' When we say that a man appreciates a danger, we mean that he forms a judgment as to the future, and that his judgment is right. *McKee* v. *Tourtellotte* (1896), 167 Mass. 69 (44 N. E. 1071, 48 L. R. A. 542).'

" ' One does not voluntarily assume a risk, within the meaning of the rule that debars a recovery, when he merely knows there is some danger, without appreciating the danger. Nor does he, on the other hand, necessarily fail to appreciate the danger because he hopes, and even expects, to encounter it without injury. If he comprehends the nature and the degree of the danger, and voluntarily takes his chance, he must abide the consequences, whether he is fortunate or unfortunate in the result of his venture. *Mundle* v. *Manufacturing Co.* (1894), 86 Me. 405 (30 Atl. 16).'

" The second step in the demonstrative process is to establish the servant's appreciation of the danger produced by the abnormal conditions in question. That this is the alternative and crucial element upon which the defense depends is sufficiently apparent from the terminology by which it is described.

" ' A servant knowing the facts may be utterly ignorant of the risks. Byles, J., in *Clarke* v. *Holmes* (1862), 7 Hurlst. & N. 937, 31 L. J. Exch. N. S. 356, 8 Jur. N. S. 992, 10 Week. Rep. 405.'

" ' A servant is chargeable with notice of what is apparent, but

not necessarily that the apparent is dangerous. *Pennsylvania Coal Co.* v. *Kelly* (1894), 54 Ill. App. 626.'

" 'The difference is between going into the service or continuing in it, "knowing that the instrumentalities employed are unsafe and dangerous," and knowing that defects exist, but not that they necessarily render the employment of a perilous character. *Galveston, etc., R. Co.* v. *Lempe* (1883), 59 Tex: 19.'

" 'It does not necessarily follow that knowledge that a master is not discharging his duty in making safe the place where he requires his employés to work will defeat a recovery by an employé injured by the master's neglect of duty; to produce this result it must be also inferable that the breach of duty augmented the dangers of the service. An employé may know that the employer is not performing his duty, and yet not know that the perils of his service are augmented. It is not, it is true, necessary that the fact that the perils of the service were increased should be established by direct evidence; it is sufficient if there be evidence from which that fact can be reasonably inferred. *Rogers* v. *Leyden* (1890), 127 Ind. 50 (26 N. E. 210).'

" 'The general rule, undoubtedly, is that a person cannot be said to take a risk, unless he knows, not only the condition of things, but also that danger exists in such conditions. *Anderson* v. *Clark* (1892), 155 Mass. 368 (29 N. E. 589).' "

See, also, note 5, p. 666, 1 Labatt on Master and Servant, for numerous cases.

This doctrine seems to comport with the rule in *Swoboda* v. *Ward*, 40 Mich. 423, where this court said:

"A party entering upon a particular employment assumes the risks and perils usual thereto. Where the machinery used is not defective, either in its construction or from want of proper repair, and where the usual and customary means are adopted to guard against accidents, if wanting in either respect, there is an increased risk, and if the servant is injured in consequence thereof, the master must be held responsible therefor.

"If, however, the servant, with full knowledge of the facts, and understanding the increased risk occasioned thereby, in the absence of any promise by the master to remedy the same, consents to and remains in the master's employ, then he voluntarily incurs such increased risk, and if he suffers damages in consequence of an injury received thereby, he will be without remedy. The fact that he remains in the master's employ under such cir-

cumstances and with such knowledge is what constitutes contributory negligence on his part.

"The master, in permitting his machinery to be thus more than ordinarily dangerous, is guilty of negligence; the servant, with full knowledge thereof, by remaining, contributes thereto. Cooley on Torts (1st Ed.), pp. 551, 552, and cases cited."

See 2 Cooley on Torts (3d Ed.), p. 1042 *et seq.*, for a discussion of these questions, and especially page 1048, where the distinguished author says:

"It is essential to the assumption of risk, not only that the servant should know the defect out of which the danger arises, but that he should appreciate the danger, or that the danger should be manifest to a man of ordinary intelligence and experience in the line of work in which the servant is engaged. A servant cannot be heard to say that he did not appreciate a danger which was manifest to an ordinarily prudent person of his intelligence and experience. An adult servant is presumed to possess ordinary intelligence and capacity, and is held in law to know and comprehend the dangers which are open and obvious to a person of ordinary understanding and experience, and he cannot show a want of such capacity without also showing that the master had notice of the fact."

There are cases where dangers, as well as defects, are so plainly obvious that courts may instruct juries that risks are assumed; when they are not so, the question is for the jury. In this case we are of the opinion that both questions were for the jury.

The judgment is reversed, and a new trial ordered.

BIRD, MOORE, BROOKE, and STONE, JJ., concurred.