## MENERE *v.* COPPER RANGE CONSOLIDATED CO.

1. MASTER AND SERVANT — ASSUMED RISK — PECULIARITY OF INJURY—MINES AND MINING.

An employé in a mine did not assume the risk of a fellow-servant falling from a ladder by reason of a space left between two connected ladders which the miners used in gaining access to the mine, though plaintiff knew of the defective place, being hurt while he was descending within the shaft in a bucket.

2. SAME—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

Nor was he chargeable with contributory negligence for failing to report the defect, which was one of original construction, to the servants having charge of the construction of such ladders, who were presumed to know of the dangerous arrangement.

3. SAME—FELLOW-SERVANT—CONCURRING NEGLIGENCE.

The negligence of a fellow-servant concurring with that of the master does not preclude plaintiff's recovery.[1]

4. SAME—PROXIMATE CAUSE—PERSONAL INJURIES.

The negligence of defendant was the proximate cause of the injury.

Error to Houghton; Streeter, J. Submitted January 10, 1912. (Docket No. 40.) Decided March 29, 1912.

Case by Paul Menere against the Copper Range Consolidated Company for personal injuries. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Reversed.

*O'Brien & LeGendre* (*George O. Driscoll*, of counsel), for appellant.

*Allen F. Rees*, for appellee.

---

[1] Negligence of fellow-servant concurring with failure of the master to establish or enforce proper rules or regulations for conduct of business, see note in 4 L. R. A. (N. S.) 516.

BLAIR, J. Plaintiff brought this action to recover damages for personal injuries alleged to have been sustained by reason of the negligence of the defendant in the construction of a certain ladderway provided for the use of its employés in the performance of their work as miners in its exploration shaft. Some 65 feet above the bottom of the shaft was a pumping station. Below this, the ladderway was constructed of ladders some 16 feet in length placed one above the other and joined together at the ends.

Youch, the shift boss, testified:

"Now, to get at this shaft and to describe it properly, the Globe shaft was an exploration shaft, and as the shaft was built it was built for a permanent working shaft, and below the pump station, the timbers that were put in there, and which are shown on the model, were permanent timbers, so that the shaft was really completed at the place where Abromovich was climbing down where these wooden ladders are, and this ladder that I have spoken of below the pump station, the wooden ladder and all the lengths of the same were nailed to the permanent timbers of that shaft * * *

"*Q.* Do you think these ladders would stay there if they made it a permanent mine?

"*A.* No, sir; I don't think it was. It was while we were there, a temporary ladderway to be used doing that exploring.

"*Q.* Don't you know that that was not the permanent ladderway to be put in after they got that sinking done? That's true isn't it?

"*A.* It was for all the while I worked there. I don't think it would be the permanent ladder to be put in there after they got a working shaft. * * * Menere had no duty to perform with reference to that ladder that I know of. The man who put in that ladder was Mr. Beaudin.

"*Q.* And he was supposed to look after the ladders in the work of repairing them and putting them in?

"*A.* He done all that work around the pumps. These ladders were not what you would call ladders that could be taken out and put in; they were in there to stay. I mean from the ladders to the pump down. How long, I don't know. They were there all the while we were sinking down that far. A miner hasn't got any right to sug-

gest to Mr. Beaudin how he should build a ladder.  I didn't feel like making a suggestion to Mr. Beaudin because I thought I might get a saucy answer.  He had put the ladder in that way.  I regarded it as unsafe, personally, the first time I seen it.   *   *   *

"*Q.* It was your duty—that is, it would be Mr. Beaudin's duty—to order the repair of that ladder?

"*A.* I couldn't say, yes or no.  As to whose duty it would be to order the repair of that ladder, well, I think it would be both of us.  Yes, in one way it would be a miner's duty to order a repair of that ladder.  No, sir; if he knew it, he wouldn't have a right to order the repair of a ladder that was spiked into the shaft, the timbers, by the man who is building the ladders.   *   *   *   Yes, the miners were pretty busy working down there.  They were running drilling machines.  At times they would shovel their own dirt, so they didn't have much time to look after the ladders.  That work was put upon Mr. Beaudin and myself.  And it was put upon me for the safety and protection of the men working down there, and also the safety of the men going up and down on the bucket.

"*Q.* So, in reality there was no duty upon the miners to report that missing step if they knew about it, was there?

"*A.* Some would, and some wouldn't.  That would be whether one man might and one might not.  There was no duty upon them to do it."

The defect in the ladderway was that, where the ends of the second and third short ladders came together, there was a double space as though one rung had been left out.  A bucket was used in the shaft to hoist and lower men and material.  A truck, or crosshead (which ran on rollers in the middle of the shaft, and ran some distance down past the pump station, but stopped before it got to the bottom), was run in connection with the bucket to keep it straight up in the shaft.  Pump boys, who worked 12-hour shifts, attended to and ran the pumps.  One Smithen was captain and had general charge of the mine, Youch was shift boss, Beaudin was in general charge of the pumps and ladderways, and Abromovich was a pump boy.  On August 24, 1907, at 12:30 o'clock, dinner time,

plaintiff and three other men were being lowered by the bucket and cross-head through the shaft. Plaintiff stood on the rim of the bucket, having one hand fast to the cross-head and holding on to the cable, or bucket-rope, with the other, riding in the usual and customary manner. Abromovich was at the pump station. He wanted to go up to the surface to dinner by means of the hoisting apparatus. He intended to ride up on the bucket and cross-head. That was customary, and a proper thing for him to do. The bucket and cross-head passed downward through the shaft past the pump station with the plaintiff and the other three men on it. Abromovich had to go down where the cross-head would stop to get on. He had to hurry to get on before they lifted the bucket up. He did not have the bucket stop for him at the pump station because he could not ring the bell, not being strong enough to pull the bell with one hand and hold on to the cross-head with the other. After the bucket and cross-head had passed the pump station, and while they were still descending, and when they were about 10 feet below him, Abromovich started down this wooden ladderway to get on the cross-head before they lifted the bucket. He was hurrying, but not going one-fourth as fast as he could, and when he got to this "long step," his feet slipped, and he could not hold fast with his hands. His feet slipped because there where that "long step" existed he thought it was the same as the other staves or rungs. He knew that the "long step" was there, only, while climbing down, he forgot it and didn't think about it. When he so missed his footing, he fell downward through the shaft and struck the plaintiff, who was holding to the cross-head and still descending through the shaft on the bucket as before stated, knocking him off the bucket and cross-head and causing him to fall to the bottom of the shaft. Plaintiff had personal knowledge of the defect in the ladderway and that it was dangerous. At the close of plaintiff's case, the court, on motion of defendant, directed a verdict for defendant on the ground of assumed risk.

In the course of his remarks the court said:

"Now, in this case, the accident occurred in the manner detailed by the testimony to you, and I think it struck you as it did me, as one of the most peculiar accidents that ever had happened."

At the opening of his brief, counsel for defendant says:

"It is difficult by a description to give a clear idea of the situation and circumstances under which there happened the extraordinary accident involved in this case, through which the plaintiff received a serious personal injury."

The danger to plaintiff in making a personal use of the defective ladder was so obvious that if he had sustained his injuries while so using it he might well be held to have assumed the risk thereof. We do not think, however, that the danger of this *most peculiar and extraordinary* accident was so obvious that plaintiff can be held as a matter of law to have assumed it. *Delbusso v. Plaster Co.*, 165 Mich. 318 (130 N. W. 702).

It is further contended that the judgment should be affirmed because plaintiff was guilty of contributory negligence, in that, being charged with the duty of seeing that the place in which he was working was safe for himself and the other employés, he failed to report the defect or take any steps to remove the danger; in permitting his knowledge of the defect and danger to pass out of his mind. This ladder was provided by the master, in the first instance, and was sufficiently permanent so that its construction involved its primary nondelegable duty to its employés. The defect is in the original construction. The men who were expressly charged with the duty of seeing that the ladder was safe for use by employés knew about its defective construction and the dangers incident thereto. Under such circumstances, the ordinary employés owe no duty to the master to notify him of what they have a right to presume he knows. *Nichols v. Railroad Co.*, 145 Mich. 643 (108 N. W. 1016); 2 Cur-

rent Law, p. 816; 4 Current Law, p. 548; 26 Cyc. p. 1208.

The negligence of the master concurring with the negligence of the fellow-servant Abromovich, his negligence does not preclude recovery. *Kleinfelt* v. *Coal Co.*, 156 Mich. 473 (121 N. W. 118, 132 Am. St. Rep. 532).

We are also of the opinion that the negligence of the defendant was a proximate cause of the accident. *White* v. *Township of Riley*, 113 Mich. 295 (71 N. W. 502).

The judgment is reversed, and a new trial ordered.

MOORE, C. J., and STEERE, MCALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.