129 278
s88NW 640
s133 322

## BARR *v.* GUELPH PATENT CASK CO.

1. TRIAL—CREDIBILITY OF WITNESSES—DIRECTING VERDICT.
   The doctrine that the uncontradicted testimony of a witness will not warrant the direction of a verdict where it is manifestly improbable in character, or is likely to have been prompted by self-interest, is referred to approvingly.

2. INJURY TO EMPLOYÉ—DUTIES—EVIDENCE—QUESTION FOR JURY.
   In an action for the death of an employé who was killed while oiling certain machinery, a superior servant testified that he showed decedent, in the first instance, just what machinery he was to oil, that deceased was not the general oiler, and that he was not required to oil the machinery at the place where he was killed. The witness also testified, however, that decedent was the only person who did any oiling in the day-time, and that it was his duty to oil any machinery that should need oiling, or to notify witness; while the engineer of the mill testified that it was the duty of a person in decedent's position to oil all machinery that should require it. *Held*, that the question whether decedent was in the performance of his duty when killed was for the jury.

3. SAME—NEGLIGENCE—REVOLVING SET-SCREW.
   Whether defendant was liable for the death of a servant who, while in the discharge of his duty, was caught by a set-screw projecting from] a rapidly-revolving shaft, the servant being ignorant of its existence, and the place where it was maintained being dimly lighted, should have been submitted to the jury.

Error to Benzie; Chittenden, J. Submitted December 10, 1901. Decided January 7, 1902.

Case by Emma Barr, administratrix of the estate of Daniel Barr, deceased, against the Guelph Patent Cask Company, for the alleged negligent killing of plaintiff's intestate. From a judgment for defendant on verdict directed by the court, plaintiff brings error. Reversed.

*Charles A. Withey* (*D. G. F. Warner*, of counsel), for appellant.

*Brennan, Donnelly & Van De Mark* and *Henry L. Lyster*, for appellee.

Moore, J.   The plaintiff is the widow and administratrix of the estate of Daniel Barr, who was killed while at work for the defendant in the basement of its sawmill. The negligence counted upon in the declaration is:

"(a) Failing to provide a place reasonably light and safe for deceased to work in, and to safely and properly place its machinery.

"(b) Taking deceased from his work piling lumber in defendant's yard (he being, to the knowledge of the defendant, wholly inexperienced in the use and care of machinery) without warning him of the dangers incident to the new duties assigned to him.

"(c) Especially in not warning deceased of the dangerous character of the place in question, and of the projecting set-screw.

" (d) In neglecting to remove or readjust said set-screw so that it would not dangerously project.

" (e) In neglecting to warn deceased or point out to him any other or better way (if there was any) to reach the bearings south of the place where the set-screw was than to go over and upon the timber next which it revolved.

" (f) In not telling the deceased of the fact or custom (if it was a fact or custom) that it was not necessary or customary to oil the said bearings south of the said set-screw when the mill was in motion.

" (g) That defendant was guilty of gross carelessness and wanton neglect of duty and the safety of others in not covering said set-screw and bearings."

Mr. Barr was upwards of 30 years of age, and a man of fair intelligence.   It is the claim of plaintiff that, before the injury, Mr. Barr had not been engaged in the use of machinery of any kind, and had never oiled any machinery until one to four days before his death; that he was set to work in the basement of a mill more than 100 feet square, not well lighted; that his duties were to wheel the refuse and sawdust coming from the trimmer saws to the furnace

room, and to oil such machinery as should need oiling. In the basement of the mill was a shaft about seven feet long, which was raised about two feet four inches above the floor. The ends of this shaft ran in boxes which were fastened to the upper side of timbers which were eight inches square. On the west end of the shaft, next the timber, was a thirteen-inch pulley. Nearly three feet east of that pulley was another, four feet in diameter, which carried a belt running to the south. About twenty inches east of the larger pulley, and next to the east timber, which carried the box in which the end of the shaft ran, there was a collar on the shaft, which was held in place by a set-screw, which projected about two inches, according to the evidence of the plaintiff. Directly north of this shaft, and two or three inches from the outer rim of the large pulley, there was a plank three inches thick and ten inches wide, fastened to the top of the two timbers which carried the collars in which the shaft ran. About four feet south of the collar with the set-screw, there was another shaft running parallel with the one already described. On the end of this shaft, directly south of the set-screw, was a twenty-four inch pulley, called a "clutch pulley." The west end of this shaft ran in a box near the clutch pulley. This box rested on a timber eight inches square. East of the set-screw three or four feet there was also machinery. The shaft carrying the collar and set-screw made 150 revolutions a minute; and it is claimed by plaintiff that the set-screw could not be observed when the shaft was revolving, and that Mr. Barr had no knowledge of its existence, and while in the discharge of his duty to oil the machinery his clothing caught in the set-screw, was nearly all torn from his body, and Mr. Barr was found, when they searched for him, under the shaft, dead. The plaintiff introduced testimony to establish the case stated in the declaration. She then called a witness by the name of Elliott, who was a filer, and the millwright who put into the mill the shaft with the collar and set-screw. It may be well to state here that the shaft with the set-screw and

collar had been run only 11 days when the accident occurred. Mr. Elliott, among other things, testified as follows:

"*Q.* Could you see it [the set-screw] when it was running?

"*A.* Yes, sir.

"*Q.* How much did it project from the shoulder?

"*A.* I do not know; it might have projected two inches or an inch and a half.

"*Q.* Now, it was Barr's duty to do all the oiling under the mill, all that was necessary to be done, was it?

"*A.* No; the night-watch did the general oiling once a day, and he oiled this fast-running machinery that had to be oiled oftener.

"*Q.* Did you show him just what he had to oil?

"*A.* Yes; I showed him just what he had to do.

"*Q.* Did you call his attention to this shaft and set-screw?

"*A.* No, sir; I did not show him anything only what he had to do.

"*Q.* When did you inform him as to what machinery to oil?

"*A.* The first morning he was sent there.

"*Q.* He was the general oiler under there?

"*A.* No, sir.  *  *  *  I never at any time instructed him to oil this machinery in the rear of this large pulley, or to oil the bearing of this large pulley itself.  *  *  *  I went with him and saw that he did it properly; saw him do it several times; I refer to the machinery I told him to oil."

It is claimed the machinery which Mr. Elliott told him to oil was not nearer than 3½ feet from the set-screw.

The judge was asked by the defendant to take the case from the jury. The court expressed himself as follows:

"The plaintiff placed Mr. James Elliott on the stand, and, while the plaintiff's attorney had intimated that his testimony might not be truthful, yet there is nothing before the court to cause it to doubt his testimony. He was the man that gave the deceased his instructions to do his work. These were the only instructions that he had. He was told how to do and what to do. The theory of the plaintiff is that he went round and climbed up on this three by ten plank, and this eight by eight, and leaned over to

oil this shaft or bearing. This was contrary to his instructions and outside of his duty. Therefore the deceased was negligent, and, if he was negligent in that regard, the plaintiff cannot recover. It would not be reasonable in this case to say that Mr. Elliott ought to have told him that he must not climb over the piston rod when he went to oil the engine, because it was no part of his duty. There is no testimony here as to the duties of this man, except the testimony of Mr. Elliott. It was assumed by the plaintiff, when they started in with the trial of this case, that Mr. Barr was the oiler in the mill. That was simply an assumption; but, as far as the proofs go, the only person who testified to the duties of this man was Mr. Elliott, and he testifies that he told him to oil certain boxes and told him how to do it, and that he could do it safely, and that there was no danger in doing it. Now, if the deceased, Mr. Barr, wished to climb round the mill in different places, and assume dangers contrary to the orders of his master, he assumed such risks himself, and the defendant is not liable. I don't think it is the duty of the court to allow cases to go to the jury where, in his judgment, there are no facts to be passed upon by a jury. I might go all through the testimony in the case. But, upon that one point alone, the case should be taken from the jury, and the motion of the defendant's attorney is granted."

The jury was then brought into court.

"*The Court:* Gentlemen, under the ruling of the court on the question of law presented in a motion by the defendant's attorney that the jury be instructed to bring in a verdict of no cause of action, you are now instructed that there is nothing here for you to consider, and your verdict will be, 'No cause of action.'

"*Mr. Van De Mark:* And the reasons, of course, your honor has embodied in your remarks just given to counsel on the motion?

"*The Court:* Yes, sir."

In making this disposition of the case the learned judge overlooked some of the important testimony in the case. Other witnesses testified that Mr. Barr was the day oiler, and that there was no other man to do any oiling in the basement during the day. Mr. Elliott himself testified:

"*A.* He was the only man that oiled there in the day-time.

"*Q.* If he should see any machinery in there that needed oiling, it was his duty to oil it, was it not?

"*A.* Well, it was his duty to oil it or notify me, one or the other. He did all the oiling that was done under the mill during the day.   *   *   *

"*Q.* I believe you stated that any oiling that was needed in there, whatever it was, it was his duty to oil it?

"*A.* If there was a box running warm, I should suppose he would put some oil on it, or notify me. I told him if anything was not right to notify me when he went in there to work."

In *Elwood* v. *Telegraph Co.*, 45 N. Y. 549 (6 Am. Rep. 140), it is said:

"It is undoubtedly the general rule that where unimpeached witnesses testify distinctly and positively to a fact, and are uncontradicted, their testimony should be credited, and have the effect of overcoming a mere presumption;   *   *   *   but this rule is subject to many qualifications. There may be such a degree of improbability in the statements themselves as to deprive them of credit, however positively made. The witnesses, though unimpeached, may have such an interest in the question at issue as to affect their credibility.   *   *   *   And, furthermore, it is often a difficult question to decide when a witness is, in a legal sense, uncontradicted. He may be contradicted by circumstances, as well as by statements of others contrary to his own. In such cases, courts and juries are not bound to refrain from exercising their judgment, and to blindly adopt the statements of the witness, for the simple reason that no other witness has denied them, and that the character of the witness is not impeached.

"Very clear and decisive evidence was required in this case to establish that the message which came over the defendant's wires was not communicated in the natural and ordinary manner. From the necessity of the case, such evidence as there is to that effect proceeds wholly from parties having an important interest in the question. Each of them, if guilty of the negligent act, would have the strongest motive to deny it, as the admission would subject him or her to severe responsibility for the consequences. This is a controlling consideration in determining whether the statements of these witnesses should be

taken as conclusive. Without imputing a want of truthfulness to these witnesses, we think that their relation to the subject-matter in controversy was of itself sufficient to take from the court the right to dispose of the case upon their evidence, and to require that the jury should pass upon the weight to be given to their statements."

See, also, *Michigan Pipe Co.* v. *Michigan Fire & Marine Ins. Co.*, 92 Mich. 482 (52 N. W. 1070, 20 L. R. A. 277).

Mr. Hammond was the engineer in the mill, and had charge of the machinery in the basement the year before. He testified, in part, as follows:

"I know where Mr. Barr was killed. At that time I was attending to my work as engineer. I saw Mr. Barr when he was at work in this basement.

"*Q.* What were his duties?

"*A.* His duties were to keep the machinery oiled underneath the mill, and empty the boxes that held the refuse from the trimmers, and wheel it into the fire-hole. That is my opinion; but that is what I saw him doing anyway. He had two lines of duty,—to keep this refuse cleared and oil the machinery.   *   *   *

"*Q.* To what extent had you seen Mr. Barr oiling there in the basement that spring?

"*A.* Oh, I had seen him working in there at different times,   *   *   *   perhaps to the extent of two, three, or four days—something like that—after this place [the shaft where he was killed] was put in here.   *   *   *

"*Q.* What do you say whether or not it is the duty of a man oiling machinery like that, in that place, to give it his attention, and oil the bearings whenever they needed it?

"*A.* I could not answer any different than to say that, if I were the oiler, and had instructions to oil, I would oil it when I thought it was necessary.

"*Q.* Whose judgment governs in regard to that matter?

"*A.* In my opinion, the man's that was doing the work."

. We think this testimony made a very plain issue of fact for the jury as to whether or not Mr. Barr was in the discharge of his duty when he was hurt. *Emlaw* v. *Emlaw*, 20 Mich. 11; *Hamilton* v. *People*, 29 Mich. 173; *Klumph* v. *Bousfield & Co.*, 112 Mich. 68 (70 N. W. 317).

It is insisted by defendant that, even though the court gave a wrong reason for his decision, the case ought not to be reversed.   Counsel say the plaintiff failed to show any negligence on the part of defendant; that employing a set-screw in the manner which was done here was not negligence; and the verdict was properly directed,— citing *Groff* v. *Mill Co.*, 58 Minn. 333 (59 N. W. 1049); *Monforton* v. *Brick Co.*, 113 Mich. 39 (71 N. W. 586); *Sakol* v. *Rickel*, 113 Mich. 476 (71 N. W. 833); and other cases.   An examination of these cases will show they are easily distinguished from the case at bar.   In the Minnesota case the record shows the oiler had been employed four months, and well knew the location of the various parts of the machinery which injured him.   In the *Sakol Case* the plaintiff had charge of the machinery where he was hurt a long time.   He generally used a lamp while he was oiling the machinery when it was running, because it was dangerous to oil it in the dark; but, on the occasion when he was hurt, he attempted to oil it in the dark, though he knew it was dangerous to approach the running machinery without a light.   In the *Monforton Case* the young man who was hurt had been warned to keep away from the shaft, and his duties did not require him to go near it.   The counsel for plaintiff do not claim the plaintiff is entitled to recover simply because a set-screw was used, but do claim it was negligence to use the set-screw where it was used when it might easily have been covered, and to put an inexperienced man at work where his duties would expose him to the danger of coming in contact with the dangerous machine, without calling his attention to the danger.   We think, under the proofs, there was a case made upon the question of the negligence of the defendant, which should be allowed to go to the jury.   The other questions have been considered, but we do not deem it necessary to discuss them.

Judgment is reversed, and new trial ordered.

HOOKER, C. J., GRANT and MONTGOMERY, JJ., concurred.   LONG, J., did not sit.