## LOBENSTEIN v. WHITEHEAD & KALES IRON CO.

1. MASTER AND SERVANT—MUNICIPAL CORPORATIONS—ORDINANCES —NEGLIGENCE—DUTY TO PROTECT OPENINGS.

An ordinance of the city of Detroit requiring owners, contractors, and builders having charge of constructing buildings more than 30 feet high to provide temporary flooring and to protect or guard any openings, had no application to a room more than 30 feet high on the roof of which defendant was constructing a smokestack, not being engaged in constructing or modeling the building.

2. SAME—DANGEROUS PLACE—PERSONAL INJURIES.

Where an inexperienced servant is put to work in a dangerous place or at dangerous labor outside the scope of his employment, his employer is liable for an injury resulting from exposure to those unusual risks which are not understood or appreciated by the servant, or are not apparent, or can only be learned by experience in doing the work. Unless the master warns, instructs, and informs the servant as to all the dangers incident to the work, which are not discoverable from ordinary observation by an inexperienced person who would have no reason to anticipate danger, the master is liable for injuries resulting from the servant's lack of knowledge, from failure to instruct him. The master is liable for injuries resulting from negligence in exposing the servant to risks which the latter is incapable of appreciating.

3. SAME—DANGERS—WARNING AND INSTRUCTING SERVANT.

It is the duty of the employer to warn his servant of unusual dangers which he may encounter in his changed work, not to infer that the servant knows of them.[1]

4. APPEAL AND ERROR—DIRECTED VERDICT—TRIAL.

Plaintiff is entitled to have his evidence considered in the light most favorable to him, on error to review a verdict directed against him.

5. SAME—NEGLIGENCE—ASSUMPTION OF RISK.

Where the defendant sent its employee to construct a

---

[1] As to the master's duty to warn or instruct servant, generally, see note in 44 L. R. A. 33.

platform around a flue opening left about 85 feet from the ground, without informing him concerning the dangers of the work to be done by the servant, who was inexperienced at that kind of labor, which also was not within the scope of his employment, the trial court erred in directing a verdict for the defendant on the ground that defendant was not negligent or that plaintiff assumed the risk.[1]

6. SAME—CONTRIBUTORY NEGLIGENCE.
Held, also, that it could not be determined as a matter of law that plaintiff was guilty of contributory negligence, or that the negligence, if any, was that of a fellow-servant.

7. SAME—NOTICE OR KNOWLEDGE.
A servant assumes only those risks which are incidental to his usual employment and those of which he had knowledge or should have known.

8. SAME—ACTIONS—DEATH ACT—SURVIVAL—ESTATES OF DECEDENTS.
Where there was an injury which resulted in death within a few minutes, the action might properly be brought under the death act, by the administrator of the decedent.

Error to Wayne; Hosmer, J. Submitted January 7, 1914. (Docket No. 4.) Decided March 26, 1914. Rehearing denied June 4, 1914.

Case by William Lobenstein as administrator of the estate of George Stierle, deceased, against the Whitehead & Kales Iron Company for the negligent killing of decedent. Judgment for defendant upon a directed verdict. Plaintiff brings error. Reversed.

*William Look* and *Duncan C. Beath (H. F. Chipman,* of counsel), for appellant.

*Luman W. Goodenough* and *Irvin Long,* for appellee.

STONE, J. This action was brought under the

[1] On the question when risks of work outside scope of employment are deemed to be assumed, see note in 48 L. R. A. 803.

"Death Act" to recover pecuniary damages for the alleged wrongful death of George Stierle, who was killed by falling 85 feet, while working for the defendant on the Edison Illuminating Company's building in the city of Detroit, where defendant had been erecting a smokestack.

The declaration alleges: That certain openings in the construction of the building had been left for stairways, elevator openings, flues, and openings in which to fit and place certain chimneys; that on September 13, 1909, defendant was engaged in erecting a scaffold or platform 85 feet above the ground, upon which its servants were to stand at the work of riveting together certain steel beams or joists at the base of one of the chimneys, and that plaintiff's intestate was sent to work upon such scaffold; that the plaintiff's intestate was hired by the defendant to run the hoisting engine, and was ignorant, unskilled, inexperienced, and uninstructed about the dangers and hazards of this extrahazardous employment. It is the claim that the riveting above alluded to was highly dangerous and extrahazardous, and required skilled and experienced workmen, and could not be done by unskilled, inexperienced, and ignorant laborers, such as plaintiff's intestate; that the defendant, on the 13th day of September, 1909, carelessly, negligently, and with knowledge of these facts, ordered and directed plaintiff's intestate to construct the scaffolding or platform around or near a certain opening or flue left in the construction of the building, for the purpose of erecting or placing a certain chimney through and upon the building at a point 85 feet above the ground, which work of constructing the scaffold plaintiff's intestate undertook to do and perform; that the defendant, well knowing of the employment of plaintiff's intestate, and of his ignorance, unskillfulness, and inexperience, negligently failed to inform him of the

dangers and hazards of the new and extrahazardous work, and failed to provide plaintiff's intestate with reasonably safe means and appliances to enable him to work as safely as the hazards incident to the employment permitted.  It also averred that defendant negligently failed to provide suitable and safe means and a suitable and safe place for doing the work in which plaintiff's intestate was engaged.  By an amended declaration the plaintiff also counted upon an ordinance of the city of Detroit entitled "Protection of persons engaged in the construction of buildings."

The plaintiff's intestate left surviving him a widow and two minor children.

The only testimony relating to the circumstances surrounding the injury was that of Joseph Darge, a witness produced for the plaintiff, who testified that at the time in question he was working for defendant as foreman; that plaintiff's decedent commenced working for the defendant in March, 1909.  This witness testified, among other things, as follows:

"*Q.* What was the employment of Mr. Stierle?

"*A.* He was hired to hoist—to run the hoisting engine, and that was what he was doing.  I did not hire him; the superintendent of the Whitehead-Kales Company hired him, and sent him over there.  I was his foreman.  He ran the hoisting engine; that is all he did.  And after he got done hoisting, and then Stecher gave me orders to take Stierle away from the engine, and rig up a scaffold for four rivets to drive on the girder.  I was running the job; that means they have got to do the way I tell them, and I have to do the way the superintendent told me.  His name was William Stecher.  Stecher gave me certain orders, and I delivered those orders to the men.

"*Q.* Was George Stierle a steelworker there?

"*A.* No.

"*Q.* Just what was he hired for?

"*A.* Engineer for running the hoist.  I have been an ironworker for ten years.

"*Q.* Do you know whether or not it takes any skill to be an ironworker?

"*A.* Why, sure, he has got to know, because, if he don't know, why you know how it is.

"*Q.* How long does it take to teach a man—an ordinary mortal—that iron work?

"*A.* Well, it is a matter probably a year, or maybe two years, or maybe three years.

"*Q.* Was George Stierle employed as a hoist engineman?

"*A.* Well, all I know is that he went onto the job and took hold of the hoisting machine—

"*The Court:* Then the order came from the superintendent to put him to what after the hoisting was done—

"*Q.* You had some orders from Mr. Stecher?

"*A.* Yes; I had my orders from Mr. Stecher. After we got the stack done, and the stuff away and down, there were four rivets missing on the girder. We had been putting a steel stack in there. This was an empty flue for another stack, and the hoisting engine was on top of the I-beam, and the girder that they could not rivet until it was brought away. You see, then, after we got the hoisting engine away from there, we got at it.

"*Q.* What did Mr. Stecher say to you, if anything, about those rivets?

"*A.* Well, then, after I got the engine away, and let it down with the derrick, with my crab winch, because you could not hoist it down with men—I used that derrick to let it down with that. When I had everything down, then Mr. Stecher came there about towards evening; he gave me the orders that he knew there was some rivets left off, and he told me to go up and rivet them with George Stierle. So I take— we were just down below when he told me them words what to do. Then we went up, I and George Stierle, and got the planks ready, and then, when he got the planks ready—that was just one, first, so I went and told him to get some rope, about 10 or 12 feet long, so he went down below and got four ropes for me, so I says, 'Now, George, you tie one on one end of the plank, and I will tie the other end to the plank.' Then when we had the ends tied on the plank, then we let it down and tied it around the girder. We tied it to

be good and safe, so George Stierle asked me that would not be wide enough—one plank—so I says it would not be wide enough, so he asked me, 'Wouldn't it be better to put another by the side of that?' I said, 'Yes.' Well, so he goes on the other side—there was some plank lying there—we got another plank, brought it over to the same place, placed it on the girder. Well, when we first found the girder, then I told George Stierle to tie them, the ends of the rope on the plank, and I would help let them down and tie them around the girder; so he done this; so he jumped on the plank where we had it first tied, and then he was tying the other, and I walked away on the other side east of the girder, and was looking down.   *   *   * Then when I was looking down, then I heard a noise back of me; then when I turned around I seen that plank, and George Stierle going down through the flue, about 85 feet down.

"Q. How wide was that flue across?

"A. That flue would be about 18 or 20 feet, nearly that. This flue was extended from the bottom of the basement to the top of where I was. The flue to the top of the roof—it was 110 feet high, but that was about 15 feet below the roof where the girders were placed, to put the base of the stack on. It was 15 feet below the roof where Stierle was working.   * * *

"Q. Now, before you called Mr. Stierle from the ground to that point to do the work that you have described, did you give him any instructions as to what to do, to save himself or protect himself?

"A. No.

"Q. Did you tell him how to build a scaffold of this kind?

"A. No.

"Q. Do you know of anybody else, or whether anybody else did give him instructions beside yourself?

"A. Not that I know of. It takes an experienced man to do that kind of work. Mr. Stierle was not an experienced man in that line."

The witness further testified that there might have been a false floor placed 5 feet below the point where Mr. Stierle was working; that the smokestack above the roof had been completed, and there was nothing

to do but this little riveting of these girders; that the work was all done on the day the accident occurred; that, in his judgment, a floor might have been placed on the flanges a little below where he and Stierle were at work.  He further testified that defendant had nothing to do with the erection of the building, with the exception of the erection of the smokestack.  The ordinance referred to was introduced in evidence.

Upon the question of the time of the death of the plaintiff's intestate, witness testified that after Stierle fell he saw him within 10 or 15 minutes, and that he was still alive; that he fell 85 feet, and upon a pile of iron.

On cross-examination the following occurred:

"*The Court:*  Is it conceded this man was killed at that time?

"*Defendant's Attorney:*  I don't know; there is no proof of that.

"Q.  Was he dead when you went down?

"A.  No.

"Q.  How long did he live?

"A.  Why, I could not tell you how long he lived.

"Q.  How do you know that he was alive?

"A.  He was down there breathing, and he must have been alive.

"Q.  Was he conscious?  Could he talk?

"A.  No; he could not talk.

"*Defendant's Attorney:*  You know he lived about two hours after that, don't you?

"A.  I don't know how long he lived.

"*The Court:*  There cannot be any question about that, but what he died as the result of the accident.

"*Defendant's Attorney:*  Do you concede he lived about two hours after this?

"*Plaintiff's Attorney:*  We do not concede any such thing.  He never regained consciousness; that is our contention.

"*Defendant's Attorney:*  Well, do you rest at that point?

"*Plaintiff's Attorney:*  Yes."

At this point, at the close of the plaintiff's case, the

defendant's attorney moved for a directed verdict in favor of the defendant:

(1) On the ground that plaintiff's decedent must have assumed the risk of this accident.

(2) On the ground that he was guilty of contributory negligence.

(3) That the defendant has not been shown to have been guilty of any negligence.

(4) That, if there was any negligence, it was the negligence of a fellow-servant.

(5) That it has been shown by the testimony that plaintiff's decedent was not instantly killed; that this action is brought under the death act, which only applies in cases of instantaneous death, therefore it must fail, and a verdict should be directed.

Thereupon the trial court directed a verdict for the defendant, mainly upon the ground that the ordinance introduced in evidence had no relation to a building of this description; and also upon the ground that the evidence did not show that the defendant was guilty of any negligence. There was motion for a new trial, which it will be unnecessary for us to dwell upon. It is sufficient to say that the motion was denied solely on the ground that the ordinance of the city had no application whatever to the case under consideration. A judgment for the defendant was entered, and the plaintiff has brought the case here for review, and the errors assigned are pointed to the directing of the verdict by the court and the reasons therefor, and that the court erred in not submitting the plaintiff's case to the jury.

The first section of the ordinance introduced upon the trial reads as follows:

"It shall be the duty of all owners, contractors, and builders, and all persons who shall have the supervision or control of the construction or modeling of any building more than 30 feet high, to put in and lay upon the upper side of the joists or girders of each story in any building, as soon as the joists or girders are laid, a good and substantial, temporary or perma-

nent floor for the protection of employees, and all persons engaged in or upon the construction of said building, in which floor no unprotected opening shall be left, and it shall be unlawful to place or put up joists or girders of another story until each lower floor is laid. And it shall be the duty of all owners, contractors, builders, or persons having the control or supervision of any building which shall be more than 30 feet high to see that all stairways, elevator openings, flues, and all other openings in the floors shall be covered or properly protected."

1. A careful examination of this ordinance leads us to the conclusion that the court did not err in holding that it had no application to the case under consideration. While the evidence is not as clear as might be desired, it appeared that, owing to the peculiar construction of this building, it was not divided into stories as buildings usually are, but consisted of one large, high room, in which were installed certain boilers and other structures which were reached by independent stairways, over the construction of which defendant had no control. By the undisputed evidence, the work of the defendant was limited to the construction of the smokestack upon the roof of the building. We think the trial court might well have placed the decision of this question upon the ground that the defendant did not come within the terms or purview of this ordinance. The ordinance relates to the duties of persons engaged in the construction of buildings. Clearly this defendant did not construct this building or model it. The ordinance imposes the duty upon the builder as the work proceeds, and makes it unlawful to place or put up joists or girders of another story until each lower floor is laid, and the further duty of covering stairways, elevator openings, and flues is imposed upon the builder or person having control or supervision of the building. We think, however, that the case should not have been

disposed of upon this question. The defendant took this building as it found it.

The first count of the declaration is based upon the common-law duty of the defendant to furnish and provide for plaintiff's decedent a safe place in which to work, and suitable means and appliances to work with. The deceased appears to have been a young man, 26 years old, who had been employed by this defendant for 6 months operating an electric motor for hoisting purposes. On the day of decedent's death the defendant was just finishing certain work of erecting a smokestack on the Edison building. The motor and the platform upon which it stood were so placed that it was necessary to move them in order to place certain rivets. The testimony tends to show that the defendant did not wish the motor disturbed until its work was done, and had agreed with another contractor to place those rivets after the motor was removed. Finally the work was done, the motor had been taken down, and plaintiff's intestate was on the ground below, when he received an order, which we think the evidence shows was not within the scope of his employment, to assist to place those four rivets. We have already referred to the testimony of Darge as to his instructions from the superintendent. That the latter represented the defendant as vice principal is not questioned here.

We think that the common-law rule is that, where an inexperienced servant is put to dangerous work, or is sent into a dangerous place to work, outside of the scope of his employment, the master is liable for all injuries resulting to the servant from being exposed to those unusual risks which are not apparent, and which are not understood or appreciated by the servant, and which can only be learned by experience in doing the work; and that, unless the master warns, instructs, and informs the servant as to all the dan-

gers incident to the work which are not discoverable from ordinary observation by an inexperienced person who would have no reason to anticipate danger, the master is liable where injury follows because of the servant's lack of knowledge, and because he was unwarned and uninformed. This principle is supported by many authorities in this State. A master is liable for injuries to his servant resulting from the master's negligence in exposing the servant to risks which the latter is incapable of appreciating. *Chicago, etc., R. Co.* v. *Bayfield,* 37 Mich. 205; *Jones* v. *Railway Co.,* 49 Mich. 573 (14 N. W. 551); *Smith* v. *Car Works,* 60 Mich. 501 (27 N. W. 662, 1 Am. St. Rep. 542); *Walker* v. *Railway Co.,* 104 Mich. 606 (62 N. W. 1032); *Courtois* v. *Paper Co.,* 172 Mich. 305 (137 N. W. 699); *Menere* v. *Consolidated Co.,* 169 Mich. 367 (135 N. W. 249).

If decedent was taken from an employment in which he had been engaged, and put by defendant in an unsafe place, without instruction, the defendant might be liable. It was defendant's duty to know, not to infer, that plaintiff's decedent had this knowledge. *Charron* v. *Carbide Co.,* 151 Mich. 687 (115 N. W. 718).

We think that (applying the rule which requires us to take the most favorable view of the plaintiff's evidence in cases where the court directs a verdict for the defendant) it cannot be said that there was no evidence of the negligence of the defendant. Neither can it be said, as matter of law, in our opinion, that the plaintiff's intestate assumed the risk, or that he was guilty of contributory negligence. We think that these were all questions of fact which should have been submitted to the jury under proper instruction. We think there was evidence that this was an extraordinary risk, both as to place and as to the appliances to be used, and plaintiff's intestate, an inexperienced

man, was, by defendant, sent into a dangerous place. *Parkhurst* v. *Johnson*, 50 Mich. 70-72 (15 N. W. 107, 45 Am. Rep. 28) ; *Smith* v. *Car Works, supra; Barr* v. *Cask Co.,* 129 Mich. 278 (88 N. W. 640).

That the question of assumption of risk was a question for the jury is sustained by the following cases: *James* v. *Mining Co.,* 55 Mich. 335 (21 N. W. 361) ; *Chicago, etc., R. Co.* v. *Bayfield, supra; Ostrander* v. *City of Lansing,* 111 Mich. 693 (70 N. W. 332).

A servant assumes only those risks which are incident to his usual employment, and of which he had knowledge, or of which he should have known. *Thomas* v. *Railroad Co.,* 114 Mich. 59 (72 N. W. 40) ; *Brown* v. *Railroad Co.,* 118 Mich. 205-208 (76 N. W. 407) ; *Shadford* v. *Railway Co.,* 121 Mich. 224 (80 N. W. 30) ; *Potter* v. *Railway Co.,* 122 Mich. 179 (81 N. W. 80, 82 N. W. 245) ; *Noble* v. *Steamship Co.,* 127 Mich. 103 (86 N. W. 520, 54 L. R. A. 456, 89 Am. St. Rep. 461) ; *Snow* v. *Power Co.,* 162 Mich. 579 (127 N. W. 677) ; *Cristanelli* v. *Mining Co.,* 154 Mich. 423 (117 N. W. 910).

We do not think that the evidence in the case would justify us in saying that the negligence complained of was that of a fellow-servant. There is no evidence that Darge was guilty of any negligence; but the negligence, if any, was that of the defendant acting through its superintendent.

2. Upon the question of whether death was instantaneous within the meaning of that term, and referring to the manner in which the question was treated by the trial court, we are of opinion that the court would not have been warranted in directing a verdict for the defendant upon that ground. Upon this subject we quote the following language of Chief Justice HOOKER, in the case of *Olivier* v. *Railway Co.,* 134 Mich. 367 (96 N. W. 434, 104 Am. St. Rep. 607, 3 Am. & Eng. Ann. Cas. 53). He said:

"We see no reason for splitting hairs as to what is meant by instantaneous death, though we can appreciate the difference between a continuing injury resulting in drowning, or death by hanging, throwing from a housetop, etc., and one where a person survives the wrongful act in an injured condition."

See, also, *West* v. *Railway,* 159 Mich. 269 (123 N. W. 1101), where it is said by Justice BROOKE, speaking for this court:

"Where there is a continuing injury, resulting in death within a few moments, it is 'instantaneous' within the meaning of the statute."

In that case the deceased continued to live for some 15 minutes after he was struck by the car, though he was dead when taken from beneath the car; and it was contended that the appropriate remedy was under the "Survival Act."

We think the following language of Chief Justice Shaw, in *Kearney* v. *Railroad Corp.,* 9 Cush. (Mass.) 108, is appropriate:

"We are to ascertain what the intent of the legislature was when they passed the law. It is not to be supposed that they intended to make a distinction between a case where the death was so instantaneous that there was no manifestation of life whatever and a case where there might be some slight spasmodic action of the body of the sufferer to indicate that life was not quite extinct."

For the errors pointed out, the judgment of the circuit court is reversed, and a new trial granted.

MCALVAY, C. J., and BROOKE, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.